UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACE ALLEN DAVITTO,

             Plaintiff,                         Civil Action No. 11-cv-15080

        v.                              District Judge Marianne O. Battani
                                              Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

             Defendant.
_____/

**REPORT AND RECOMMENDATION TO
DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [11] AND
GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [13]**

      Plaintiff Jace Davitto appeals Defendant Commissioner of Social Security's denial of his application for social security benefits for adult children who become disabled before age 22. (*See* Dkt. 1, Compl.; Tr. 11.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 11, 13). For the reasons set forth below, this Court finds that substantial evidence supports the ALJ's primary rationale: that when Plaintiff is compliant with medication, his mental-impairment symptoms do not preclude all work. For this reason and those set forth below, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 11) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 13) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## I. BACKGROUND

Plaintiff was 15 years old on the date he alleges he became disabled.  (*See* Tr. 10, 138.)  At the time of the ALJ's decision, he was 19 years old.  (*See* Tr. 21, 138.)  Plaintiff maintains that his mental impairments, including his anxiety, have prevented him from working.  (*See* Tr. 39, 52-53.)

### A.  Procedural History

On September 16, 2010, Plaintiff applied for adult-child disability insurance benefits asserting that he became disabled under the Social Security Act on January 1, 2007.  (Tr. 10.)  On April 20, 2011, Administrative Law Judge John Rabaut held a hearing where Plaintiff testified in support of his disability claim.  (*See* Tr. 28-62.)  In a May 5, 2011 decision, ALJ Rabaut found that Plaintiff was not disabled.  (*See* Tr. 10-21.)  That became the final decision of the Commissioner on September 13, 2011, when the Social Security Administration's Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  This suit followed.  (Dkt. 1, Compl.)

### B.  Medical Evidence

Plaintiff's biological father committed suicide when Plaintiff was 12 years old, and it appears that Plaintiff's depression and anxiety began, or worsened, not long after.  (Tr. 401.)

Plaintiff began counseling at least by 13 years old; Paul Savickas, Ph. D. noted that Plaintiff felt depressed, irritable, withdrawn, and helpless.  (Tr. 269-70.)

In 2006, when Plaintiff was 14 years old, he somersaulted off the roof of his garage onto a trampoline and broke his ankle.  (Tr. 281-82; *see also* Tr. 271-72, 274-75, 277-78, 281-303.)  The associated hospital records note that Plaintiff's "comorbidities" included attention deficit hyperactivity disorder ("ADHD"), mood disorder, and previous suicidal ideation.  (Tr. 281.)  They also reflect a history of alcohol, marijuana, Vicodin, and Oxycontin use.  (Tr. 291.)

2

Plaintiff was also hospitalized for anger outbursts and moodiness in 2006. (Tr. 319.) He was discharged with prescriptions for Lexapro (an antidepressant), Adderall (a stimulant), and Olanzapine (an antipsychotic). (Tr. 318.) It appears that Plaintiff remained on these or similar medications until August 2008, and, as a result, Plaintiff did very well in school and was able to control his anger and irritability. (Tr. 318.)

In August 2008, Plaintiff, then 17 years old, began treatment with Dr. Iyad Alkhouri, a psychiatrist. (Tr. 318-20.) Plaintiff had recently stopped taking his medications and developed other stressors in his life, including his brother's return home. (Tr. 318.) Plaintiff, however, believed that, other than a decrease in his ability to pay attention, quitting his medication had not led to significant behavioral changes. (*Id.*) Plaintiff's mother and stepfather disagreed: they told Dr. Alkhouri that there had been a dramatic change and that Plaintiff had become irritable to the point where they could not ask him to do things around the house without him losing his temper. (*Id.*) Plaintiff's mother also expressed concern over Plaintiff's marijuana use, but did not know that Plaintiff had used marijuana since age 12 and, if anything, he had recently reduced his intake. (*Id.*) Dr. Alkhouri performed a mental-status exam and noted that Plaintiff was calm and respectful, and had logical thoughts with no psychosis. (Tr. 319.) He noted that Plaintiff's memory was intact and while "his attention span [was] probably a little bit shorter than average," "that [was] not unusual for a teenager his age." (Tr. 319.) Dr. Alkhouri diagnosed Plaintiff with ADHD, a mood disorder, and marijuana dependancy. (*Id.*) He assigned Plaintiff a Global Assessment Functioning score of 65. (*Id.*)[1] Plaintiff agreed to restart Adderall for his ADHD. (*Id.*) In September 2008, however,

---

[1] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV* "), 30-34 (4th ed., Text Revision 2000). It ranges from 100

Dr. Alkhouri noted that Plaintiff had not been completely compliant with his medication. (Tr. 327.)

In October 2008, Plaintiff saw Dr. Alkhouri three times. At the first visit, Plaintiff reported getting "angry" with his parents and said that he had not been speaking with his stepfather. (Tr. 328.) Plaintiff reported having a very short fuse, feeling down overall, and needing marijuana to get going. (*Id.*) Although school was not going well for Plaintiff, Dr. Alkhouri noted that "everybody loves him there, including the principal who was trying to get him as much help as possible." (*Id.*) Dr. Alkhouri noted that Plaintiff's mental-status was sad and distant, but also humorous and approachable. (Tr. 329.) He remarked, "[Mr. Davitto] is really a solid guy[] who seems to be going through a tough time with lot[s] of worries and anxiety, and irritability." (*Id.*) Dr. Alkhouri spent "quite a bit of time" convincing Plaintiff to restart his pyschotropic medication. (*Id.*) Dr. Alkhouri discontinued Adderall and prescribed Abilify and Celexa. (*Id.*) Later in October 2008, Plaintiff reported that Celexa made him feel tired and sedated. (Tr. 330.) At his third October 2008 appointment with Dr. Alkhouri, Plaintiff stated that the antidepressants might be providing some limited benefit. (Tr. 332.) He reported, however, that he remained irritable, angry, unhappy about things, and stressed about school. (*Id.*) Dr. Alkhouri's diagnoses were major depressive disorder, recurrent, moderate without psychotic features; a history of nonspecific mood disorder; ADHD; and marijuana dependance. (*Id.*) Dr. Alkhouri increased Plaintiff's Celexa dosage. (*Id.*)

In early November 2008, Dr. Alkhouri noted, "[Mr. Davitto has] the [most] optimistic

_____

(superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32.

A GAF score of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV* at 34.

demeanor that I have seen in a while." (Tr. 333.) Mostly at the behest of his girlfriend, Plaintiff had

quit using marijuana. (*Id.*) Plaintiff's primary problem was school: students were bugging him

about his brother's issues. (*Id.*) Plaintiff was also struggling with his attention and was concerned

about catching up with his school work. (*Id.*) In completing a mental-status exam, Dr. Alkhouri

noted that Plaintiff seemed to be in a "very good mood," and had no hypomania, psychosis, or

suicidal ideation. (*Id.*)

Later in November 2008, however, Plaintiff reported that he had become irritable and touchy

and would lose his temper (particularly with his mother). (Tr. 335.) It appears that Plaintiff was not

taking his medication correctly; Dr. Alkhouri remarked, "[he] . . . seems to be getting . . . slightly

more irritable[;] . . . then we found out that he has continued to take the whole 40 milligrams of

Celexa on top of his Wellbutrin." (*Id.*) Dr. Alkhouri's mental-status exam revealed that Plaintiff

was "still pretty ruminative about . . . his life . . . and how he hates going to school." (*Id.*) He also

noted, however, "he seems to be improving in his insight and ability to interact." (*Id.*)

It appears that Plaintiff last treated with Dr. Alkhouri in December 2008. On December 4,

2008, Dr. Alkhouri noted,

> [Mr. Davitto] quit taking his medications because he is saying that
> they made him feel worse. He has been having [a] difficult time
> complying with any medication regimen that he has been prescribed
> for quite a while. It seems that he picks and chooses what medication
> he wants to take, but the baseline is that he does not like the way his
> medications make him feel. There have been significant arguments
> between him and his mother who is insisting that the only way to fix
> him 'and straighten him up' is to get him into the hospital. We had
> set up an appointment . . . to get him into substance abuse group and
> this has not started yet.

(Tr. 336.) Dr. Alkhouri altered Plaintiff's medication and was hopeful that the new regimen would

be less problematic for Plaintiff. (*Id.*) At the end of December 2008, however, Plaintiff was still

5

struggling with medication compliance and mood lability.  (Tr. 322.)  Dr. Alkhouri noted that Plaintiff had "no improvement" with his insight and that he seemed to struggle with anger, which made all his relationships difficult.  (*Id.*)

On January 17, 2009, Plaintiff was admitted to an addiction recovery center; he was discharged against medical advice on February 13, 2009.  (Tr. 359.)

In February 2009, Plaintiff, still 17 years old, took a standardized achievement test.  (Tr. 166.)  During the exam he appeared fidgety and tense or worried.  (*Id.*)  Plaintiff, however, persisted with difficult tasks.  (*Id.*)  The test results reflect that Plaintiff's academic skills were within the average range for his age, and his ability to apply those skills were within the "low average" range.  (*Id.*)  Plaintiff's scores were average in reading and writing, but lower in mathematics, including "very low" in math calculations.  (*Id.*)

An Individualized Education Program Team Report from March 2009 indicates that Plaintiff had recently returned to school, and that he had been receiving special education services because of ADHD. (Tr. 153.)  Plaintiff's teachers reported that Plaintiff had a difficult time keeping up with his work, keeping his focus on the task at hand, and remembering information that he had learned.  (*Id.*)

On March 28, 2009, Plaintiff took 16 Abilify pills in an attempt to commit suicide.  (*See* Tr. 339-57.)  Emergency-room notes indicate that Plaintiff had an altercation with his girlfriend where his girlfriend hit him and he pushed her.  (Tr. 343.)  When Plaintiff's girlfriend reported the incident to her parents, they reportedly went to Plaintiff's house and beat him.  (*Id.*)  Plaintiff felt like life was hopeless: he was doing poorly in school and did not have a job, a cellphone, or friends.  (*Id.*)  Upon admission, Plaintiff had impaired reality testing and bizarre behavior, and was noted to be a

danger to himself, others, and/or property.   (Tr. 352.)  Plaintiff's GAF score was 26.  (Tr. 357.)[2]

Plaintiff remained in the hospital until April 4, 2009.  (Tr. 348-57; *see also* Tr. 358.)  At discharge,

he was diagnosed with bipolar disorder, depressed; ADHD; and polysubstance abuse.  (Tr. 348.)

Plaintiff's GAF score had improved to 50.  (*Id.*)[3]

On June 10, 2009, Plaintiff again attempted suicide — this time by ingesting rat poisoning.

(Tr. 364-70.)  He was having difficulty coping with stressors, did not have anywhere to go, and was

experiencing anxiety and depression.   (Tr. 364.)   During his approximately week-long

hospitalization, Plaintiff acknowledged that he had previously done well when on his medications

and indicated that it was a mistake to stop taking them.  (*Id.*)  Plaintiff agreed to go back on his

medications.  (*Id.*)  At discharge, Plaintiff's GAF score was in the 55 to 60 range.  (*Id.*)[4]  The chronic

nature of Plaintiff's problems were identified as one of Plaintiff's weaknesses, as well as

polysubstance abuse, depression and bipolar disorder, a family history of substance abuse, and

conflicts with his mother.  (Tr. 365.)

The administrative record contains limited records from June 2009, when Plaintiff was nearly

18 years old, to October 2010, when Plaintiff was 19 years old.  (*See* Tr. 371-73, 375, 402.)  It

appears that Plaintiff was homeless during this period (*see* Tr. 373), and only occasionally sought

---

[2]A GAF score of 21 to 30 indicates that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."

[3]A GAF score of 45 to 50 reflects "serious symptoms (e.g. suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *DSM-IV* at 34.

[4]A GAF of 51 to 60 corresponds to "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM–IV* at 34.

medical treatment from an urgent care center. (*See* Tr. 371-73, 375.) Those records indicate that Plaintiff's primary complaints were physical, but, at least in September 2010, the center prescribed anxiety and/or depression medications.

On October 18, 2010, Plaintiff was referred for a biopsychosocial assessment at The Guidance Center, an agency offering mental-health treatment. (Tr. 380-88.) Plaintiff was accompanied by his mother. (Tr. 380.) Plaintiff reported, "I've had to stay [at] some crazy places and have been around some crazy people for the last 2 years." (*Id.*) He noted that his living situation contributed to his insomnia and anxiety. (*Id.*) Plaintiff believed that nothing good was going to happen, and that he did not have the means to do anything. (*Id.*)

Two days later, on October 20, 2010, Plaintiff had a psychiatric evaluation with Dr. Eric Kubrak at The Guidance Center. (Tr. 393-94.) Plaintiff was "somewhat hyper vigilant" and fidgety. (Tr. 394.) He admitted to using drugs and sexual behavior to cope with stressors. (*Id.*) He had several flare-ups with his mother during the evaluation; Plaintiff explained that he was "different from her" and that she did not "understand[] what he [was going] through." (*Id.*) Plaintiff's mother reported that she did not trust Plaintiff; apparently, Plaintiff had broken into her home in the past and also started a bonfire in the back yard. (Tr. 393.) Dr. Kubrak diagnosed bipolar disorder, not otherwise specified, with prominent irritability; a history of polychemical abuse in partial remission; and personality disorder, not otherwise specified, with mixed traits including antisocial tendencies. (*Id.*) Dr. Kubrak prescribed an antidepressant. (Tr. 395.)

On November 2, 2010, in connection with Plaintiff's application for disability benefits, Plaintiff and his mother each completed a functional report. In response to a question about Plaintiff's abilities before his disability, Plaintiff's mother indicated that he had "been this way since

birth," but had "gotten worse." (Tr. 201.) She provided that she tried to spend as little time as possible with Plaintiff because they argued. (Tr. 200.) She stated that Plaintiff was argumentative and abusive, and that he would shut down, isolate himself, and become enraged. (Tr. 205.) She indicated that Plaintiff had difficulty with his memory and concentration and that he could sit still for only 10 to 15 minutes. (Tr. 205.)

Plaintiff provided similar information on his November 2010 function report. (*See* Tr. 207-14.) He indicated that he was homeless and that his sleep varied from two to fifteen hours per night. (Tr. 208.) He stated that he would go days without showering or grooming. (*Id.*) Plaintiff provided that he could pay attention for only 10 to 15 minutes and that he had no hobbies because he could not focus or stick with anything. (Tr. 211-12.)

On November 3, 2010, Plaintiff's case manager at The Guidance Center remarked, "Client is homeless by choice, [his mother] stated that he can stay with her if he is not using drugs, [but] he chooses to use marijuana." (Tr. 390.)

On November 17, 2010, Plaintiff's mother called The Guidance Center to inform Plaintiff's therapist that he would not make his appointment. (Tr. 399.) Plaintiff's mother added that her son would not follow her rules. (*Id.*)

Plaintiff did, however, attend his same-day appointment with Dr. Kubrak. (Tr. 392.) Dr. Kubrak noted that Plaintiff felt "numb on the one hand and internal rage on the other." (*Id.*) Plaintiff stated that he knew that he had no functional capacity. (*Id.*) Dr. Kubrak provided, "[his] affect is tense. He is irritable. He uses profanity quite freely. [He] seems to be making an effort at seeking help. At least he got here today on his own without his mother." (*Id.*) Dr. Kubrak prescribed a new medication. (*Id.*) Also, because Plaintiff emphasized that he had a positive

9

response to Adderall in the past, Dr. Kubrak restarted Plaintiff on that medication.

On February 28, 2011. Dr. Kubrak completed a Mental Residual Functional Capacity Assessment form. (Tr. 403-08.) He provided that Plaintiff was markedly limited — the most severe rating on the form — in every mental-functioning category save one. (Tr. 403-04.) For example, Dr. Kubrak opined that Plaintiff had marked limitations in his ability to understand and remember one or two-step instructions, to make simple work-related decisions, and to ask simple questions or request assistance. (*Id.*) In support of these findings, Dr. Kubrak attached his psychiatric evaluation from October 20, 2010. (Tr. 405-07.)

In March 2011, Plaintiff's acquaintances and family members provided statements to the Social Security Administration. (Tr. 231-59.) Plaintiff's mother stated that Plaintiff's memory was poor: "[h]e thinks he did things that he absolutely did not do." (Tr. 231.) She opined that her son was "delusional" and believed her to be his enemy when in fact she "ha[d] his back." (Tr. 232.) She reported that Plaintiff had anxiety and panic attacks on a daily basis and obsessed over things like the cleanliness of his food. (Tr. 233.) She also indicated that Plaintiff engaged in extreme behavior; for example, confronting someone and then going to great lengths to make up with the person. (Tr. 234.)

Plaintiff's then-former girlfriend also wrote a statement on Plaintiff's behalf. (Tr. 236-38.) She provided that she was living at Plaintiff's mother's home and that Plaintiff had difficulty sleeping and had horrible nightmares. (Tr. 236.) She stated that when something unexpected arose, Plaintiff could not calm down enough to handle the situation. (Tr. 237.) She indicated that Plaintiff's mother gave him a single task to complete, washing dishes, but Plaintiff did not complete the task and instead overreacted because someone had told him what to do. (*Id.*)

10

Plaintiff's stepfather reported that Plaintiff had frequent mood changes. (Tr. 240-41.) He stated that Plaintiff had difficulty deciding how to do simple tasks. (Tr. 241.) As an example, Plaintiff's stepfather provided that Plaintiff could not figure out what to do with a dirty dish in the sink, got angry, and then gave up. (*Id.*)

Plaintiff's brother also offered a statement. (Tr. 242-44.) He provided that Plaintiff could not stick with a job. (Tr. 242.) He explained, "Even [when] helping me do something like load up my car to move, he helped for about [five] minutes then announced that he was 'tired of this [stuff]' and walked away." (Tr. 242.) Plaintiff's brother further stated, "[w]e are all on edge, walking on egg shells, living with Jace. There is no peace in the house when Jace is there." (Tr. 244.)

Plaintiff's godmother provided that Plaintiff "cannot concentrate on anything for long. He can't persist long enough to play a game of scrabble." (Tr. 245.) She stated that Plaintiff's mother and stepfather were both "disabled" and that Plaintiff did not realize how disabled they were and that they needed help. (Tr. 245.) As an example of Plaintiff's anxiousness, Plaintiff's godmother stated that if they decided to spontaneously make some stops on their way downtown, Plaintiff would "freak[] out" and tell her that he needed to leave. (Tr. 246.)

Plaintiff's pastor also provided a statement in March 2011. (Tr. 251-59.) He believed that Plaintiff was incapable of sustaining a schedule on a long-term basis. (Tr. 252.) He also stated that Plaintiff could not handle constructive criticism "at all" and could not be supervised. (Tr. 253-54.)

11

### C. Testimony at the Hearing Before the ALJ

#### 1. Plaintiff's Testimony

Plaintiff testified about his education, past work-experience, and current condition at his April 20, 2011 hearing before ALJ Rabaut.  Plaintiff said that he had done "[t]errible" in school.  (Tr. 43.)  He explained, "I can't sit around a bunch of people and focus on what I gotta do, because like all the stuff around me gives me racing thoughts . . . ."  (Tr. 43.)  Plaintiff acknowledged, however, that one school year, when he was on Adderall, he did "really" well and even did other students' homework for money.  (Tr. 43-44.)

Plaintiff testified that he had never held a full-time position and that the longest he had worked at any job was "[a] month or two."  (Tr. 35.)  Plaintiff stated, "every job I've had, they always tell me . . . I'm doing stuff wrong."  (Tr. 37.)  He explained, "I'd listen to the person throughly.  Like I'd totally listen to them, and then I'd go to do the task that they told me to do, and I'd forget, and . . . I'd go ask them, . . . 'Am I doing this right?'  Sometimes it'd be no.  Sometimes it'd be yes.  So, I know my concentration is off a little bit somewhere . . . ."  (Tr. 43.)

Plaintiff also testified to other aspects of his mental impairments.  He explained that he did not like people, could not listen to them, and would become "really agitated, irritable."  (Tr. 38.)  Plaintiff also stated that when he felt "really energetic, and really panicky" he would medicate with marijuana or alcohol.  (Tr. 39.)  He explained, "when I wake up, . . . there's a lot of thoughts going on in my head, and . . . I can't calm myself down . . . unless I have like something to help out."  (Tr. 39.)  Plaintiff indicated that playing music might help (Plaintiff apparently plays the guitar (Tr. 384)), but qualified, "I'm a bum, so I don't really have the potential to do anything with it."  (*Id.*)  Plaintiff indicated that physicians had recently prescribed medications, but, after giving them four

12

weeks to take effect, he stopped taking them.  (Tr. 45.)  He explained that the medication did not help his sleep issues, anxiety, or his bipolar disorder.  (Tr. 45.)  He noted that he felt no "change" with the medication, but, when drinking or smoking, he "actually fe[lt] calmer."  (Tr. 46.)

In terms of daily activities, Plaintiff indicated that he was transient and stayed with various people.  (*See* Tr. 33, 49.)  He stated that he would try to help with the dishes or other chores when he was staying with someone.  (Tr. 39.)  He explained that he would spend much of his day walking around, "look[ing] for [a] smoke, look[ing] for beer or something."  (Tr. 49.)

### 2. *The Vocational Expert's Testimony*

The ALJ asked a vocational expert ("VE") whether work would be available for someone of Plaintiff's age, education, and work experience who was capable of performing a job with the following restrictions: (1) only simple, routine, and repetitive tasks, (2) no fast-paced production, (3) only simple work-related decision-making, (4) few, if any, workplace changes, (5) no interaction with the public, and (6) only occasional interaction with coworkers but no joint-tasks with coworkers.  (Tr. 44.)  The VE testified that there would be "unskilled" work that such an individual could perform, including, small products assembler, hand packager, and visual inspector.  (Tr. 55-56.)  The VE testified that, in southeastern Michigan, there were about 2,500, 2,500, and 1,000 such jobs, respectively.  (Tr. 56.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

There are several ways for a social security claimant to qualify for adult-child disability benefits.  As applicable here, a child of an individual who dies "fully or currently insured" is entitled to insurance benefits if he was under a "disability" before the age of 22 and was dependent on the insured individual at the time of the insured's death.  *See* 42 U.S.C. § 402(d)(1).  The Social Security

13

Act defines "disability" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a).

The regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

See 20 C.F.R. §§ 404.1520, 416.920; see also Heston v. Comm'r of Soc. Sec., 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]."  Preslar v. Sec'y of Health and Human Servs., 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Rabaut found that Plaintiff had not turned 22 years old as of the alleged disability onset date of January 1, 2007, and that Plaintiff had not engaged in any substantial gainful

14

activity since that date.  (Tr. 12.)  At step two, he found that Plaintiff had the following severe impairments: bipolar disorder, polysubstance abuse, antisocial personality disorder, and ADHD. (*Id.*)  Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment.  (Tr. 13.)  Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform work at all exertional levels but with the following nonexertional limitations: (1) only simple, routine, and repetitive tasks, (2) no fast-paced production, (3) only simple work-related decision-making, (4) few, if any, workplace changes, (5) no interaction with the public, and (6) only occasional interaction with coworkers but no joint-tasks with coworkers.  (Tr. 14.)  At step four, the ALJ found that Plaintiff had no past relevant work. (Tr. 20.)  At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity.  (Tr. 20.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 21.)

## III.  STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Plaintiff claims that the ALJ erred in four ways. For one, he says that the ALJ's conclusion at step three, that his impairments did not meet or medically equal an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1, is not supported by substantial evidence. (Pl.'s Mot. Summ. J. at 12-21.) Plaintiff also says that the ALJ erred by discounting his credibility. (*Id.* at 21-24.) Relatedly,

16

Plaintiff maintains that the ALJ erred by discounting the statements of his friends and family.  (*Id.* at 26-28.)  Finally, Plaintiff claims that the ALJ erred in rejecting Dr. Kubrak's functional limitations and, accordingly, the hypotheticals to the vocational expert did not accurately portray his limitations.  (*Id.* at 25-26.)

Before turning to the details of these claims of error, it is critical to determine the validity of a premise underlying much, if not all, of the ALJ's disability determination.  At multiple points in his narrative, the ALJ reasoned that when Plaintiff was compliant with his medications, he was able to perform well in school, even to the extent of being able to do other students' homework.  (Tr. 13, 15, 16, 19, 20.)  And reading his opinion as a whole, it is plain that the ALJ believed that the symptoms from Plaintiff's mental impairments are not disabling — so long as Plaintiff is compliant with his medication.  Although there may be evidentiary support for the opposite conclusion, substantial evidence supports this determination.

For about a two-year period, from 2006 to 2008, Plaintiff was compliant with his medication regimen and had good results.  (Tr. 318; *see also* Tr. 44.)  During this period, Plaintiff did very well in school.  (Tr. 318.)  In fact, in August 2008, Dr. Alkhouri remarked, "since his hospitalization in 2006 . . . . [Jace Davitto's] outburst of anger and irritability had been under control and everything seem[ed] to be pretty much peaceful in his life."  (Tr. 318.)  Plaintiff himself told the ALJ that Adderrall "totally helped" and that, in the 10th grade (likely the 2007-08 school year), he did "really good."  (Tr. 43-44.)  And, as the ALJ repeatedly noted in his disability decision, Plaintiff said he was even able to do "[other] kids' homework for money."  (Tr. 43.)

Then, for the remainder of the disability period at issue, it appears that Plaintiff did not have a steady medication regimen and, not coincidently, had rather severe symptoms.  In or around

17

August 2008, Plaintiff stopped taking his medications. (Tr. 318.) His parents reported that, as a result, his irritability increased to the point where he was "completely inattentive" and would lose his temper if they asked him do something. (Tr. 318.) Plaintiff himself, although denying other symptoms, acknowledged that stopping his medication had adversely affected his attention; he told Dr. Alkhouri that his friends had even noticed that change. (Tr. 319.) In December 2008, Dr. Alkhouri noted, "He has been having a difficult time complying with any medication regimen that he has been prescribed for quite a while." (Tr. 336.) Not long thereafter, Plaintiff had multiple hospitalizations and two documented suicide attempts. (Tr. 339-57, 359, 364-70.) While hospitalized in June 2009, the attending physician noted, "[Mr. Davitto] did very well on [Lexapro, Lamictal, and Abilify], but he himself took it upon himself to stop [that combination], which obviously at this time he feels is a mistake[;] [he] claimed that when he was taking them he was doing very well." (Tr. 364.)

Plaintiff then received minimal treatment until the fall of 2010. On October 20, 2010, Dr. Kubrak started Plaintiff on an antipsychotic medication (Tr. 394), yet, about a month later, Plaintiff reported that he had taken the medication for just two weeks (Tr. 392). Further, Plaintiff was not then taking Adderall, but acknowledged that it "helped to some extent." (Tr. 392.) It appears that Plaintiff did not see Dr. Kubrak again before he concluded that Plaintiff had "marked" limitations in almost every mental-functioning category.

In March 2011, Plaintiff's friends and family signed statements in support of Plaintiff's disability application. But at the April 20, 2011 hearing before ALJ Rabaut, Plaintiff testified that he had recently stopped his medication regimen because, after trying it for four weeks, he believed it was not helping. Plaintiff told the ALJ that with the medication he could not "feel a change," but

with alcohol or marijuana he could.  (Tr. 46.)

Accordingly, while there may be other ways to reconcile the administrative record, the ALJ provided a reasonable narrative.  Namely, when Plaintiff was not compliant with his medication, i.e., from August 2008 through the ALJ's decision, he suffered severe symptoms from his mental impairments.  But, when compliant, i.e., from June 2006 to August 2008, Plaintiff retained the ability to perform the type of simple, unskilled tasks set forth by the ALJ in the RFC assessment.

Moreover, Plaintiff has not shown that the ALJ erred in concluding that his ability to work should be determined based on his abilities when compliant with medication.  In fact, the law suggests the contrary.  *See Bailey v. Astrue*, No. 3:09-CV-1094, 2010 WL 2389709, at *5 (M.D. Tenn. May 18, 2010) *report and recommendation adopted*, 2010 WL 2389724 (M.D. Tenn. June 9, 2010) ("It is clear that Plaintiff's ADHD seriously interferes with her day-to-day life, but, particularly in the presence of medication, the ALJ had substantial evidence to discount Plaintiff's claim that the ADHD very seriously limited her activities."); *Bishop ex rel. M.B. v. Comm'r of Soc. Sec.*, No. 1:08-CV-799, 2009 WL 3207155, at *3 (W.D. Mich. Sept. 23, 2009) (holding that ALJ's finding that claimant had a "marked" rather than "extreme" limitation in the ability to acquire and use information was supported by substantial evidence where the claimant showed major improvement after taking his ADHD medication); *cf.* 20 C.F.R. § 404.1530(a) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work.").

As to the specifics of Plaintiff's claims of error, a corollary of the finding that substantial evidence supports the ALJ's conclusion that Plaintiff's mental impairments are significantly less severe when medication complaint, is that substantial evidence supports the ALJ's discounting of

19

Dr. Kubrak's opinion, Plaintiff's credibility, and the statements offered by Plaintiff's friends and family.

Beginning with Dr. Kubrak's opinion, the ALJ believed that Plaintiff's abilities when on medication were inconsistent with Dr. Kubrak's findings that Plaintiff had marked limitations in virtually every mental functioning category, including those involving only very simple tasks. For the reasons provided, this was a reasonable conclusion and alone was probably enough for the ALJ to severely discount Dr. Kubrak's opinion. But the ALJ also gave other reasons for assigning the opinion "little weight." (Tr. 19.) For one, the ALJ rightly considered the fact that Dr. Kubrak had seen Plaintiff on only two occasions before issuing his opinion. Dr. Kubrak's opinion was therefore not a "treating source" opinion, *see Kornecky*, 167 F. App'x at 506, *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007), and the ALJ reasonably gave the opinion less weight than what would be accorded to one based on a lengthier, more established relationship, *see* 20 C.F.R. § 404.1527. There is also some merit in the ALJ's conclusion that some of Dr. Kubrak's findings, for example, that Plaintiff was markedly limited in his ability to ask simple questions, were in tension with Plaintiff's ability to stay at various friends' houses, his attempts to help out with chores while staying at those houses, and his ability to spend his days looking for cigarettes, beer, and money. (*See* Tr. 19-20, 49-50.) In sum then, especially given that substantial evidence supports the ALJ's rationale that Plaintiff's symptoms were manageable with medication, Plaintiff has not demonstrated that the ALJ reversibly erred in assigning Dr. Kubrak's severe limitations "little weight."

Plaintiff also claims that the ALJ erred in discounting his credibility and the credibility of his friends and family who submitted statements in support of his disability claim. The ALJ explained,

20

Although the record indicates the claimant received mental health treatment for his conditions, the record also indicates a history of noncompliance with prescribed medications and recommendations. The claimant quit taking his medications, failed to show for numerous mental health appointments, and discharged himself from a rehabilitation center against medical advice (Exhibit 6F, 7F, and 9F). Records show that when the claimant was compliant with his medi[c]ations, he made improvements at school, socially, and to his overall well-being (Exhibits 3F and 7F). Although the record does contain evidence of two suicide attempts, the record also shows that once the claimant received treatment and started taking his medications, he had drastic improvement to his symptoms.

Moreover, the claimant testified at the hearing that he was able to achieve good grades during the tenth grade. More specifically, he indicated that he completed homework assignments for other students for money in addition to his own assignments. This testimony is contrary to nearly all of the signed statements in the record from the claimant's family and friends indicating the claimant had difficulty concentrating and focusing. In fact, this shows the claimant was able to maintain concentration to not only complete his own work, but the work of other students as long as he was motivated.

(Tr. 19-20; *see also* Tr. 15-16.) Restated, the ALJ reasoned that because Plaintiff's symptoms were manageable (when he was compliant with medication), his statements of severe symptoms, and the similar statements of friends and family, were not fully credible. The Court has already concluded that substantial evidence supports the ALJ's underlying premise. Substantial evidence therefore also supports the conclusion.

Finally, Plaintiff says that the ALJ erred in determining that his mental impairments did not meet or medically equal a listed impairment. Plaintiff claims that his impairments in fact meet or medically equal Listing 12.08 and Listing 12.09. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.08, 12.09. Both listings require that a claimant satisfy two of the following four "B criteria": (1) marked restrictions in activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence, or pace, and (4) repeated episodes of

decompensation, each of extended duration.  *See id.*  "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.C.  The ALJ found that Plaintiff had less-than "marked" limitations in each of the first three B criteria.  (Tr. 13-14.) Substantial evidence supports these conclusions.  While close, substantial evidence also supports a finding that Plaintiff did not have repeated episodes of decompensation, each of extended duration.[5]

"Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.C.1.  Plaintiff (and his mother) stated that he would not shower or change his clothes for days at a time.  (Tr. 201, 208.)  But the ALJ reasonably discounted these statements because Plaintiff also acknowledged that he had the ability to perform these tasks.  (Tr. 13, 48.)  In fact, as the ALJ noted, a hospital record indicates that even when Plaintiff's GAF score was 26, he was still able to care for his basic needs and provide for himself.  (Tr. 13, 352, 357.)  The ALJ also correctly noted that in Plaintiff's self-completed function report, he indicated that he was able to shop for food and cigarettes.  (Tr. 13 (citing Tr. 210).)  Plaintiff also mentioned to a mental-health

_____

[5]As discussed further below, contrary to the ALJ's finding, Plaintiff arguably had one episode of decompensation of extended duration.  But the Court believes that substantial evidence supports the ALJ's broader conclusion that "the claimant's mental impairments do not cause . . . 'repeated' episodes of decompensation, each of extended duration."  (Tr. 14); *cf. Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) (finding ALJ's failure to rate "B criteria" a procedural error subject to a court's harmless-error review).

22

provider that he enjoyed riding his bike and playing guitar. (Tr. 384.) Further, as discussed above, the ALJ reasonably discounted Dr. Kubrak's opinion and the statements of severe limitations offered by Plaintiff and his friends and family as inconsistent with Plaintiff's abilities when medication compliant. Thus, in all, while the ALJ possibly erred in concluding that Plaintiff was only mildly limited in this B criteria, substantial evidence supports a less-than "marked" rating.

Substantial evidence also supports the ALJ's conclusion that Plaintiff had "moderate" limitations in maintaining social functioning. (Tr. 13.) "Social functioning includes the capacity to interact independently, appropriately, effectively, and on a sustained basis with others. It includes the ability to communicate effectively with others." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.C.2. The ALJ was correct that Plaintiff had a girlfriend for a time and, at the time of the hearing, had friends that he often stayed with. (Tr. 13, 33, 41, 47, 333.) It is true that Dr. Kubrak, Plaintiff, and Plaintiff's friends and family indicated that Plaintiff was severely limited in his ability to get along with others and accept criticism. However, as discussed, it is also true that, when on medication, Plaintiff was much less irritable. (Tr. 318, 364.) Accordingly, while close, the Court believes that substantial evidence supports the conclusion that, when Plaintiff is medication compliant, he has only "moderate" difficulties in social functioning.

The ALJ similarly found that Plaintiff had "moderate" limitations in concentration, persistence, or pace. This too was reasonable. "Concentration, persistence or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.C.3. The ALJ reasoned, "[t]he claimant wrote that he could pay attention for 10 to 15 minutes, but testified he was able to complete other students' homework for money as well as

23

achieve good grades for himself . . . .  Although the claimant does have a history of attention problems, the records indicate it was controllable with Adderall . . . ."  (Tr. 13-14.)  This rationale has already been discussed at length.  Substantial evidence supports it.  Accordingly, the Court believes that the ALJ reasonably concluded that Plaintiff, when on medication, was not markedly limited in this B criteria.

Finally, the term "repeated episodes of decompensation, each of extended duration" means "three episodes [of decompensation] within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.C.4.  In turn, an episode of decompensation is an "exacerbation[] or temporary increase[] in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Id.*  An episode of decompensation may be inferred from "medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode."  *Id.*

Although substantial evidence arguably supports a finding that Plaintiff met this B criteria, substantial evidence also supports the opposite conclusion.  Plaintiff was hospitalized four times in 2009.  First, beginning on January 17, 2009, Plaintiff was admitted to an addiction recovery center for about four weeks.  (Tr. 359.)  Plaintiff's condition during this time is unknown, but the Court acknowledges that Plaintiff's stay may qualify as an episode of decompensation of extended duration.  Second, in late March 2009, Plaintiff was hospitalized for a suicide attempt; but treatment

allowed Plaintiff to be discharged about a week later. (Tr. 343, 348.) At discharge, Plaintiff was "free of suicidal or homicidal ideations, thoughts or plans and [was] motivated for treatment." (Tr. 348.) Accordingly, this episode of decompensation was not of extended duration. Third, Plaintiff was hospitalized in May 2009 for drug abuse. (Tr. 380.) However, the duration of this hospitalization, and Plaintiff's condition, is unknown. (*See id.* Tr. 380.) Substantial evidence therefore supports the inference that this was not an episode of decompensation of extended duration. Fourth, Plaintiff was hospitalized for about a week in June 2009 for a second suicide attempt. (Tr. 364-70.) At discharge, however, Plaintiff's GAF was 55 to 60, and the discharge notes provide, "because he is not suicidal or homicidal; he is not psychotic; he is compliant with the medications, he is really not appropriate for long-term inpatient hospitalization." (Tr. 364.) Accordingly, this too was not an episode of decompensation of extended duration. The Court therefore believes that substantial evidence supports the conclusion that Plaintiff did not have three two-week episodes of decompensation within a one-year period. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.C.4. Further, while closer, substantial evidence also supports the conclusion that Plaintiff did not have "more frequent episodes of shorter duration" such that they "may be used to substitute for the listed finding in a determination of equivalence." *See id.*

## V.  CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that substantial evidence supports the ALJ's primary rationale: that when Plaintiff is compliant with medication, his mental-impairment symptoms do not preclude all work. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 11) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 13) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner

of Social Security be AFFIRMED.

## VI.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson _____
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  January 31, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 31, 2013.

s/Jane Johnson _____
Deputy Clerk

26